No. 99-462

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 230

301 Mont. 259

9 P. 3d 38

KATIE ONSTAD,

Plaintiff and Respondent,

v.

PAYLESS SHOESOURCE, a corporation, and

PAYLESS STORE #2655 IN BILLINGS,

MONTANA,

Defendants and Appellants.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

Honorable Russell C. Fagg, Judge Presiding

COUNSEL OF RECORD:

For Appellants:

Thomas Singer (argued), Moulton Law Firm, Billings, Montana

James L. Jones (argued) and William A. Cole, Dorsey & Whitney,

Billings, Montana

For Respondent:

A. Clifford Edwards (argued), Elizabeth A. Halverson and Roberta

Anner-Hughes, Edwards, Tolstedt & Frickle, Billings, Montana

Argued: April 7, 2000

Submitted: April 27, 2000

Decided: August 24, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1 A Thirteenth Judicial District Court, Yellowstone County, jury awarded Katie Onstad $500,000 in compensatory damages and $1 million in punitive damages on her complaint that her employer, Payless ShoeSource, failed to provide her with a safe place to work. Payless appeals. We affirm.

¶2 The issues are:

¶3 1. Whether the District Court erred in rejecting Payless's workers' compensation exclusive remedy defense.

¶4 2. Whether the court erroneously allowed police officers to give expert opinion testimony when they were never qualified as experts.

¶5 3. Whether the court erroneously gave conflicting instructions as to causation and

intervening superseding cause.

¶6 4. Whether the compensatory damage award is excessive and unsupported by the evidence.

¶7 5. Whether the court erred in approving punitive damages.

¶8 On September 23, 1997, Katie Onstad was assaulted by a stranger, later identified as Timothy Luplow, while she was working as a clerk at a Payless shoe store in Billings, Montana. Onstad, then eighteen years old, was working alone at about 7 p.m. when Luplow entered the store. He grabbed her waist and squeezed her "butt" from behind as she was stocking shelves. Onstad told him not to touch her and went into the back storeroom to call for help on the telephone, but Luplow forced his way into the storeroom with her. She then ran and hid in the employee bathroom, locking the door.

¶9 After about five minutes, Onstad heard the bell ring at the front of the store and assumed that either Luplow had left or another customer had entered the store. She came out of the bathroom only to be assaulted again by Luplow. Luplow restrained Onstad by grabbing her from behind and holding his hand over her mouth, demanding sex with threats to kill her if she refused. She resisted, and they struggled. He finally knocked her to the floor and stood over her masturbating, then ejaculated on her. Afterward, he left through the front of the store.

¶10 Onstad ran out the store's back door to a nearby restaurant for help, eluding Luplow in the alley on the way. She was taken by ambulance to a hospital where she was interviewed by police and then released in the care of her father. Based upon Onstad's description, Luplow was apprehended and arrested.

¶11 In this action, Onstad alleged that Payless was negligent in failing to provide a safe place for her to work. Citing prior incidents in which a female Billings Payless employee had been "flashed" by a male exhibitionist at work, Onstad complained that Payless took no steps to warn her of that danger, to instruct her on how to avoid such danger while at work, or to take adequate safety and security precautions at the store. Onstad alleged that she suffered from posttraumatic stress syndrome as a result of Luplow's attack.

¶12 In a three-day jury trial, Onstad presented evidence of two prior incidents in which an assailant, later identified as Luplow, had exposed himself to a female employee in Billings

Payless stores. Both incidents had occurred within nineteen months prior to the attack on Onstad, and the second incident had occurred in the same store where Onstad was assaulted. Onstad also presented evidence of the armed robbery of a Billings Payless store in February of 1997. She contended that following those events, Payless should have stepped up precautions for its employees' safety in the affected stores by such means as double-staffing and supplying employees with personal alarm signal devices. Payless took the position that the attack on Onstad was a random, unpredictable event.

¶13 The jury uniformly and unanimously found in favor of Onstad and against Payless. In a special verdict, the jury found that Payless was negligent; that Onstad suffered serious or severe emotional distress and that Payless's negligence was a cause of that distress; that there was no superseding, intervening cause that cut off Payless's liability; that Onstad sustained $500,000 in compensatory damages; and that Payless's conduct amounted to malice, thereby making it liable to Onstad for punitive damages. After presentation of further evidence addressed to the punitive damage issue, the jury awarded Onstad an additional $1 million in punitive damages. The District Court affirmed that award and denied Payless's motion for a new trial.

## Issue 1

¶14 Did the District Court err in rejecting Payless's workers' compensation exclusive remedy defense?

¶15 Section 39-71-411, MCA, provides that an employer is not liable for the death of or injury to an employee covered by the Workers' Compensation Act. However, in 1987, Montana's legislature amended the workers' compensation statutes to expressly exclude from workers' compensation coverage claims for injury arising from "emotional or mental stress" or "a nonphysical stimulus or injury." *See* § 39-71-119(3), MCA. Moreover,

> [i]t is the intent of the legislature that stress claims, often referred to as "mental-mental" claims and "mental-physical claims," are not compensable under Montana's workers' compensation and occupational disease laws. . . . [N]ot all injuries are compensable under the present system[.]

Section 39-71-105(5), MCA. The viability of Payless's exclusive remedy defense hinges upon whether Onstad's injury was covered by workers' compensation, in which case this tort action would be prohibited.

¶16 As a threshold argument on appeal, Payless asserts that the Workers' Compensation Court, not the District Court, should have made the initial determination of whether Onstad's injuries were covered by workers' compensation. Payless points out that because Onstad never filed a workers' compensation claim, the Workers' Compensation Court has not had the opportunity to consider the present case.

¶17 This Court has stated that a district court has jurisdiction to hear tort claims as well as any affirmative defenses thereto, including the defense of workers' compensation exclusivity. *Brown v. Ehlert* (1992), 255 Mont. 140, 145-46, 841 P.2d 510, 514. Payless distinguishes *Brown* from the present case on the basis that *Brown* involved failure to plead the exclusivity defense, resulting in its waiver. However, Payless has not shown any reason why the foregoing rule stated in *Brown* would not remain good law. Nor has Payless cited authority which would require Onstad to seek and be denied workers' compensation benefits before her tort claim may be heard.

¶18 Payless has cited authority from other jurisdictions which would support a ruling that the Workers' Compensation Court must make the initial determination of compensability. *See Bubnell v. Holmes Ambulance Service Corp.* (N.Y. App. Div. 1990), 562 N.Y.S.2d 533 (it is "well-settled" that where there exists a mixed question of law and fact concerning the applicability of workers' compensation law, the matter should be decided by the Workers' Compensation Board); *Yount v. Davis* (Mo. Ct. App. 1993), 846 S.W.2d 780 (a trial court lacked subject matter jurisdiction to determine whether an employer's alleged sexual harassment and assault were acts arising out of and in the course of employment); *Winters v. Dalton* (Mich. App. 1994), 523 N.W.2d 636, 638 (a determination of whether an employee's injuries grew out of or occurred in the course of the employment relationship "is initially within the exclusive jurisdiction of the Bureau of Workers' Disability Compensation").

¶19 Nevertheless, in line with our prior case law, we conclude that the District Court had jurisdiction to adjudicate whether Onstad's tort claim was barred, as a matter of law, under the exclusive remedy provision. "Permitting piecemeal litigation of the various issues involved in . . . [a] District Court action would be a terrible waste of judicial resources and the parties' time and money." *CNA Ins. Companies v. Dunn* (1995), 273 Mont. 295, 300, 902 P.2d 1014, 1017.

¶20 We next consider Payless's substantive arguments on its exclusive remedy defense. Payless first raised this issue as an affirmative defense in its answer to Onstad's complaint.

Prior to trial, Payless moved for summary judgment that the complaint must be dismissed based on the workers' compensation exclusivity clause. In response, Onstad moved to strike the motion for summary judgment on grounds that it was untimely.

¶21 The court granted Onstad's motion, striking Payless's summary judgment motion as a sanction for Payless's failure to file it in a timely manner as required under the scheduling order established for this case. The court then went on to state that even on the merits, the motion would not be properly granted under Montana law, because Onstad's injuries were either "mental-mental" or "mental-physical" and therefore not compensable under the Workers' Compensation Act. The court did not, however, go so far as to explicitly grant Onstad summary judgment on this question.

¶22 Because the District Court's pretrial dismissal of Payless's summary judgment motion was a sanction for untimely filing of that motion, we do not consider that ruling as the court's decision on the exclusivity defense. In its next opportunity to rule on the question, the court took a more definitive position, however, and it is that ruling to which we direct our attention.

¶23 At the close of Onstad's case-in-chief, Payless moved for a directed verdict on the exclusive remedy defense. It argued that Onstad's own trial evidence established that she had suffered a physical injury which resulted in the development or aggravation of a disabling mental condition. In what Payless maintains was the District Court's second erroneous ruling on this subject, the court denied the motion, pointing out that Payless did not have an expert witness on this subject. The court went on to state that the evidence indicated that "most of the injury was mental," and it was therefore going to deny Payless's motion for directed verdict on the workers' compensation issue.

¶24 The court effectively not only denied Payless's motion for directed verdict, but also granted a directed verdict for Onstad on the workers' compensation exclusivity defense. We now consider whether that implicit ruling was correct.

¶25 A district court "may grant a directed verdict only when it appears as a matter of law that the nonmoving party could not recover upon any view of the evidence, including the legitimate inferences to be drawn from the evidence." *King v. Zimmerman* (1994), 266 Mont. 54, 59, 878 P.2d 895, 899 (citation omitted). "A motion for a directed verdict should only be granted when there is a complete absence of any evidence to warrant submission to the jury and all factual inferences must be viewed in the light most

favorable to the nonmoving party." *Moralli v. Lake County* (1992), 255 Mont. 23, 27, 839 P.2d 1287, 1289. We review a district court's decision regarding a motion for a directed verdict to determine if the court abused its discretion. *See Nelson v. Flathead Valley Transit* (1992), 251 Mont. 269, 274, 824 P.2d 263, 267.

¶26 Citing *Sykes v. Republic Coal Co.* (1933), 94 Mont. 239, 22 P.2d 157, and *Schumacher v. Empire Steel Mfg. Co.* (1977), 175 Mont. 411, 574 P.2d 987, Payless points out that where a mental injury is preceded by a physical injury, the resulting disability is compensable under workers' compensation. In making this argument, Payless relies upon the only evidence that Onstad suffered physical injury from the assault: her own deposition testimony that she had a visibly reddened neck where Luplow grabbed her.

¶27 Payless asserts that a physical injury need not be serious in order to justify workers' compensation coverage of mental injury arising therefrom. In support, it cites *Blythe v. Radiometer America, Inc.* (1993), 262 Mont. 464, 866 P.2d 218. Blythe, a hospital worker, was pricked by a needle contaminated with the HIV virus. He later asserted that he suffered from psychosis as a result of the stress of fearing that he had contracted AIDS. Blythe received medical and disability benefits under the Workers' Compensation Act for his psychosis.

¶28 The issue of whether Blythe had originally suffered a compensable physical injury which led to his mental injury was neither posed nor adjudicated, however. Blythe filed for benefits under the Workers' Compensation Act and his employer accepted liability. *Blythe*, 262 Mont. at 467, 866 P.2d at 220. Unlike Onstad's injury in the present case, the issue of whether Blythe's injury was subject to the Workers' Compensation Act was never in question.

¶29 The present case is further factually distinguishable from *Blythe* in that Onstad does not allege that her mental damages arose from the only physical injury of which there is evidence-the red marks on her neck where Luplow grabbed her. In that respect, the present case is more comparable to *Yarborough v. MMIA* (1997), 282 Mont. 475, 938 P.2d 679, than to *Blythe.*

¶30 Yarborough, a firefighter, suffered posttraumatic stress disorder which he alleged arose out of a fire in which his face and hands were burned. He filed a workers' compensation claim for temporary total disability, permanent partial disability, and medical benefits. The Workers' Compensation Court ruled that because the evidence

indicated Yarborough's condition arose from emotional or mental stress, it was excluded from the definition of injury as set forth at § 39-71-119, MCA. This Court affirmed the denial of Yarborough's claim, noting that although Yarborough had suffered burns to his face and hands, no medical expert had testified that his posttraumatic stress disability resulted from those physical injuries. *Yarborough*, 282 Mont. at 483, 938 P.2d at 684.

¶31 When the District Court ruled on Payless's motion for directed verdict, the evidence concerning Onstad's injuries consisted of testimony by Onstad and her mother; the testimony of Dr. Marian Martin, a clinical psychologist who had evaluated Onstad at her attorney's request to determine how this incident had affected her and to make recommendations of what might be done to help her; and the testimony of licensed clinical social worker Linda Crummet, who had counseled Onstad. Although Payless correctly points out that Dr. Martin testified that the trauma to Onstad would not have been as great had she not been physically touched, none of the evidence in the record connects Onstad's posttraumatic stress to the post-assault red marks on her neck. Instead, the evidence clearly indicated that Onstad's trauma arose from the mental stress of contending with Luplow's attack. Payless simply did not produce any evidence that Onstad's mental condition is a result of a physical injury to her during the attack.

¶32 In the resulting absence of any factual dispute, we conclude that Payless's exclusivity defense failed as a matter of law, and we hold that the District Court was correct in rejecting that defense. The workers' compensation exclusivity clause does not bar this action, because Onstad's injury is not compensable under the present workers' compensation system in Montana. Because we have so concluded, we do not further consider Payless's third allegation of error on this subject-that the court erred in rejecting Payless's offered jury instruction asking the jury to find whether Onstad's posttraumatic stress resulted from a physical stimulus.

Issue 2

¶33 Did the court erroneously allow police officers to give expert opinion testimony when they were never qualified as experts?

¶34 In his opening statement, Payless's counsel outlined the facts regarding the two previous incidents in which Luplow had exposed himself to another employee in Billings Payless stores. Although both incidents were reported to the police, Luplow was neither identified as the culprit nor apprehended either time.

¶35 The attorney for Payless told the jury the evidence would show that after the first time Luplow exposed himself in a Billings mall Payless store in February 1996, the investigating police officer told the victim, "This guy's a harmless pervert. He is in this for the thrill. He is not going to hurt you." Later in his opening statement, counsel repeated, "we do know the police think this is somebody that was not going to hurt her." Counsel then discussed Luplow's second indecent exposure incident with the same Payless employee, in May of 1997, at the store in which Onstad was later assaulted. In that incident, Luplow remained in the store masturbating while his victim was on the telephone calling the police. Payless's attorney again characterized the police response as, "He is not going to hurt you. He is basically a harmless pervert."

¶36 In her case-in-chief, Onstad presented testimony by three Billings police officers who investigated the assault. As part of her examination of those officers, Onstad asked questions in two subject areas challenged by Payless: the efficacy of security precautions taken in the Payless store where Onstad worked, and the predictability of an escalation in severity of a sexual offender's actions. Payless objected to those questions on grounds that they would elicit inadmissible lay testimony, that such evidence was irrelevant, and that it was "way beyond lay opinion." Onstad justified the questions as responses to the above remarks made in Payless's opening statement.

¶37 Payless cites *Rocky Mountain Enterprises, Inc. v. Pierce Flooring* (1997), 286 Mont. 282, 951 P.2d 1326, for the general proposition that lay witnesses may not give opinions on topics requiring expert testimony. Payless's position is that the issues of adequate store security and the escalation of severity in a sexual deviate's actions demanded expert opinion. Payless asserts that admission of the objected-to testimony was reversible error, citing the requirement under Rule 26(b)(4)(A)(i), M.R.Civ.P., that parties must disclose the names and testimony of intended expert witnesses prior to trial. Onstad did not identify the police officers as expert witnesses prior to trial.

¶38 In further support of its position, Payless cites *Massman v. City of Helena* (1989), 237 Mont. 234, 773 P.2d 1206. In *Massman*, the plaintiff offered to introduce testimony by an assistant fire chief as to the effect of the firefighting methods used on the containment of a fire at issue in the case. The trial court ruled that this testimony would constitute expert opinion which had not been disclosed prior to trial and excluded it. Affirming that ruling, this Court stated:

> [H]is opinion, about the most effective methods for combating such a fire, was

based on that specialized, technical knowledge obtained from his fire training and work as an assistant fire chief. As such, the substance of his opinion constituted an expert opinion rather than a lay witness opinion.

*Massman*, 237 Mont. at 241, 773 P.2d at 1210. Payless contends that the situation here is similar.

¶39 Our standard of review of a trial court's ruling on the admissibility of evidence is whether the court abused its discretion. *Massman*, 237 Mont. at 240, 773 P.2d at 1210. In the present case, the District Court allowed the police officers to answer the objected-to questions under Rule 701, M.R.Evid. That rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

¶40 This Court has condoned police officer testimony on matters as to which they have extensive experience and are properly qualified through training and experience. *Hislop v. Cady* (1993), 261 Mont. 243, 249, 862 P.2d 388, 392. In *Hislop*, the officer testified to his opinion about the cause of an accident, based upon his experience in accident investigation.

¶41 Onstad points out that with all three police officers, her counsel laid Rule 701 foundation that their opinions sprang from their work and experience as police officers. One officer testified that it is "common knowledge" that employee safety increases when two employees are present in a business instead of just one. The officers also opined that a Billings police officer would not advise a crime victim that Luplow's behavior in the first two incidents was merely that of a "harmless pervert."

¶42 The record reveals that the trial court responded to Payless's objections about the police officers' testimony in a careful and considered fashion, recognizing that Payless itself had raised the issues discussed in that testimony, in its opening statement. The court limited the testimony within the range allowed under Rule 701, M.R.Evid., regarding lay opinions. We hold that the court did not abuse its discretion in admitting the officers' testimony.

Issue 3

¶43 Did the court erroneously give conflicting instructions as to causation and superseding, intervening cause?

¶44 Payless does not assert that the District Court omitted to correctly instruct the jury on its theory of the case. Instead, while conceding that the instructions were correct statements of the law, Payless asserts that they are confusing when viewed together.

¶45 The court's Instruction No. 19 read:

> More than one person may be liable for causing an injury. A defendant may not avoid liability by claiming that some other person whether or not named as a defendant in this action helped cause the injury.
>
> Payless argues that the court erred in giving this instruction in a case also involving a defense of superseding, intervening cause. Payless asserts that the above instruction was inconsistent with Instruction Nos. 16 and 18, in which the jury was correctly instructed that if Luplow's criminal act against Onstad was a superseding, intervening cause of her injury, Payless could avoid liability. Citing *Skelton v. Great Northern Ry. Co.* (1940), 110 Mont. 257, 100 P.2d 929, Payless states that when a trial court gives conflicting and confusing jury instructions, it commits reversible error.

¶46 In addition to taking the position at trial that Luplow's attack on Onstad was a superseding, intervening cause, Payless also placed blame for the attack on the Billings police department's low-key response to the two earlier "flashing" incidents. Payless's counsel argued both theories during closing argument. Instruction No. 19 was appropriate as to the police department defense, and Instruction Nos. 16 and 18 were appropriate as to the defense that Luplow's attack was a superseding, intervening cause.

¶47 Additionally, nothing in the record indicates that the jury was confused by the instructions given. During deliberations, the jury sent out no written questions to the court. It deliberated less than two hours before unanimously agreeing on its answers to the six special verdict questions. We hold that the District Court did not give erroneously conflicting instructions as to causation and superseding, intervening cause.

Issue 4

¶48 Is the compensatory damage award excessive and unsupported by the evidence?

¶49 Payless points out that the evidence of Onstad's special damages was limited to testimony that she may incur future counseling expenses of between $9,000 and $18,000. Notwithstanding that her ambulance and hospital expenses incurred immediately following the assault were paid through workers' compensation, Onstad has taken the position that she does not seek damages for any physical injury. Payless argues that the "limited" testimony from psychologist Martin, counselor Crummet, Onstad herself, and Onstad's mother does not support the amount of general damages awarded, especially when viewed in comparison with damages awarded in other reported cases involving severe burns, chronic pain, life-long disabling conditions, and posttraumatic stress.

¶50 Damages must in all cases be reasonable. Section 27-1-302, MCA. "Thus, an award must be reduced when it substantially exceeds that which the evidence can sustain." *Maurer v. Clausen Distributing Co.* (1996), 275 Mont. 229, 237, 912 P.2d 195, 199. However, this Court's scope of review of jury verdicts is limited. The amount to be awarded as damages is properly left to the jury, and the court on appeal will not substitute its judgment for that of the jury-particularly where, as here, the trial court has approved the verdict by denying a new trial. Only when the amount awarded is so grossly out of proportion to the injury as to shock the conscience will an appellate court intervene. *Frisnegger v. Gibson* (1979), 183 Mont. 57, 598 P.2d 574, following *Salvail v. Great Northern Ry. Co.* (1970), 156 Mont. 12, 473 P.2d 549.

¶51 In the present case, Onstad testified at trial about her terror during Luplow's attack. In her written statement made following the attack, she said, "I was so afraid during this whole time. I honestly think he was going to rape me and then kill me." Onstad's mother testified that following the attack, Onstad withdrew from college, returned to live with her parents, and, for the next several months, "was very withdrawn. She slept a lot. She didn't sleep at night, but during the day she just continued sleeping a lot. She went nowhere. She didn't visit with friends. She was scared and totally not herself. She was just kind of totally withdrawn." In addition, Dr. Martin testified that as a result of the attack, Onstad's "sense of safety, security, her sense of herself has really been violated, she felt extremely powerless, and also ended up really embarrassing her and humiliating her. Ashamed. It's affected her whole sense of self-esteem and self-confidence."

¶52 The jury was properly instructed that Onstad was entitled to reasonable compensation for any pain and suffering she experienced and would reasonably probably experience in

the future, and that the law does not set a definite standard by which to calculate compensation for mental pain and suffering. After considering all of the evidence under the applicable standard of review, we conclude that the amount of compensatory damages awarded by the jury is not so grossly out of proportion to Onstad's posttraumatic stress injury as to shock the conscience.

## Issue 5

¶53 Did the court err in approving punitive damages?

¶54 Under this issue, Payless makes two arguments. It first asserts that Onstad did not establish "actual malice," thereby failing to establish a necessary foundation element for punitive damages. Payless also claims that the District Court failed to adequately review the support for the award of punitive damages as required under § 27-1-221(7)(c), MCA.

¶55 Punitive damages may be awarded only when the defendant has been found guilty of actual fraud or actual malice. Section 27-1-221(1), MCA. Payless points out that to establish actual malice, which Onstad alleged, Onstad was required to prove that Payless had

> knowledge of facts or intentionally disregard[ed] facts that create[d] a high probability of injury to the plaintiff and:
>
> (a) deliberately proceed[ed] to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
>
> (b) deliberately proceed[ed] to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221(2), MCA. Payless claims that while it may have been negligent in failing to increase security at the store where Onstad worked following the two "flashing" incidents, there was no proof of a high probability of danger to Onstad before she was assaulted or that anyone associated with Payless knew that there was a high probability that the "flasher" would escalate his behavior to attempted rape.

¶56 The jury was instructed on the definition of malice, and it specifically found that Payless's conduct amounted to malice. Our standard of review of a jury's finding of fact is whether there was substantial evidence to support the finding. *Cartwright v. Equitable Life*

*Assur.* (1996), 276 Mont. 1, 23, 914 P.2d 976, 990. In our review of jury verdicts in civil cases, we have stated that the prevailing party is entitled to any reasonable inference that can be drawn from the facts which are proven and that we do not decide whether the verdict was correct or whether the jury made the right decision. We have further stated that we will not lightly overturn the verdict of a finder of fact, especially a jury; that we will not disturb the jury's findings unless they are inherently impossible to believe; and that the test of substantial credible evidence allows for reversal only if there is an absence of probative facts to support the verdict. *Sandman v. Farmers Ins. Exchange*, 1998 MT 286, ¶ 41, 291 Mont. 456, ¶ 41, 969 P.2d 277, ¶ 41.

¶57 Under the above standard of review, we conclude that substantial evidence supported the jury's finding of malice. Payless's national store security supervisor admitted on cross-examination to the absence of double staffing or any means of defense or notification for Onstad if she were attacked at the Payless store, despite corporate knowledge of prior crimes in Billing Payless stores. He acknowledged, in his videotaped deposition which was shown to the jury, foreseeability that a lone female store employee could be overpowered and taken to the back room, and, as a result, suffer severe damage to her emotional health. His response to a question by Onstad's counsel as to why a $1.60 personal alarm was not made available to Onstad included the remark, "We operate a business to make a profit." The jury also heard the Payless store security supervisor describe Payless's elaborate electronic reporting system for employee theft and its much less elaborate reporting system for crimes in its stores, together with the elimination of all local or even regional spending for safety and security. Finally, the store security supervisor testified that he personally authorized the installation of multiple new security systems at the store where Onstad was assaulted within 48 hours after her attack.

¶58 Payless's second argument on punitive damages is that the District Court did not adequately demonstrate consideration of the critical facts relative to such damages as required under § 27-1-221(7)(c), MCA. The statute provides that after reviewing a jury's award of punitive damages, the court must

> clearly state [the] reasons for increasing, decreasing, or not increasing or decreasing the punitive damages award of the jury in findings of fact and conclusions of law, demonstrating consideration of each of the factors listed in subsection (7)(b).

Section 27-1-221(7)(c), MCA. The factors which the court must consider under subsection (7)(b) are: the nature and reprehensibility of the defendant's wrongdoing; the extent of the

defendant's wrongdoing; the intent of the defendant in committing the wrong; the profitability of the defendant's wrongdoing, if applicable; the amount of actual damages awarded by the jury; the defendant's net worth; previous awards of punitive or exemplary damages against the defendant based upon the same wrongful act; potential or prior criminal sanctions against the defendant based upon the same wrongful act; and any other circumstances that may operate to increase or reduce punitive damages without wholly defeating them.

¶59 Following the jury's award of punitive damages, the District Court held a hearing and oral argument on whether it should increase or decrease the punitive damages. At the end of the hearing, the court announced from the bench its intent to approve the award of punitive damages. The court did not at that time enumerate its consideration of the above factors, although in its subsequent written findings, the court made individual findings on each of the nine statutory factors. Payless complains that the statute requires the court to demonstrate that it considered the statutory factors before approving the award, not after.

¶60 In their arguments to the court on this subject, counsel addressed each of the above statutory factors to which the court was to give consideration. In its written findings addressing each of the statutory factors, the court noted, *inter alia*, the jury's finding that Payless's intent rose to the level of actual malice and that the punitive damage award represented only one-eighth of one percent of Payless's net worth. Stating that it "strongly believes in the American jury system and the collective wisdom of twelve people," the court affirmed the punitive damage award.

¶61 Under these circumstances, we conclude it is immaterial that the District Court did not detail from the bench its analysis of each of the statutory factors as to the award of punitive damages. We hold that the court has satisfied the statutory requirements of clearly stating its reasons for not disturbing the damages awarded by the jury and demonstrating consideration of each of the factors enumerated in the statute.

¶62 Having ruled in Onstad's favor on each of the issues Payless has raised on appeal, we affirm the judgment of the District Court in its entirety.

/S/ J. A. TURNAGE

We concur:

## /S/ JIM REGNIER

Justice Terry N. Trieweiler specially concurring.

¶63 I concur with the majority opinion which affirms the judgment of the District Court. However, I specially concur with the majority's resolution of Issue No. 1. I agree with the result arrived at, but would do so for different reasons.

¶64 The exclusive remedy provision of the Workers' Compensation Act is found at § 39-71-411, MCA. It provides in relevant part that:

[A]n employer is not subject to any liability whatever for the death of or *personal injury* to an employee covered by the Workers' Compensation Act . . . .

(Emphasis added.)

¶65 The exclusive remedy provision only applies to employees who have been injured in the course of their employment or the families of employees who have died as a result of injuries sustained during the course of their employment. "Injury" for the purpose of the Workers' Compensation Act is defined at § 39-71-119, MCA. The definition was narrowed in 1987 and again in 1995 at the behest of the state's employers, to limit their liability for workers' compensation claims. It now defines injury as follows:

> (1) "Injury" or "injured" means:
>
> (a) internal or external physical harm to the body that is established by objective medical findings . . . .

In this case, the employer sought coverage under the Workers' Compensation Act, rather than to avoid the Workers' Compensation Act, but failed to demonstrate by objective medical findings that there was internal or external physical harm to Katie Onstad. In fact, the employer produced no medical evidence. The fact that Onstad's medical records or her statements make reference to red marks on her neck, does not constitute objective medical findings of physical harm.

¶66 For these reasons, I would conclude that Onstad had no coverage pursuant to the Workers' Compensation Act for the consequences of the assault upon her. Therefore, she was not barred by the exclusive remedy provision of the act from suing her employer for

the consequences of that assault.

¶67 I otherwise agree with what is said in the majority opinion.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing specially concurring opinion.

/S/ WILLIAM E. HUNT, SR.

Justice W. William Leaphart, dissenting.

¶68 I dissent from the Court's conclusion on Issue number two: "Whether the court erroneously allowed police officers to give expert opinion testimony when they were never qualified as experts?"

¶69 Rule 701, M.R.Evid., provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Montana's Rule 701 is identical to its federal counterpart, Rule 701, Fed.R.Evid.

¶70 Onstad, in her case-in-chief, presented testimony from three Billings police officers. Onstad elicited testimony from these officers as to the efficacy of security precautions taken in the Payless store and the predictability of an escalation in severity of a sexual offender's actions. Payless objected to those questions as eliciting inadmissible lay testimony under Rule 701, M.R.Evid.

¶71 This Court notes that Onstad laid Rule 701 foundation that the officers' opinions sprang from "their work and experience as police officers" and that one officer testified that it is "common knowledge" that employee safety increases when two employees are present in a business instead of one. Further, the Court notes that the officers "opined that a Billings police officer would not advise a crime victim that Luplow's behavior in the first two incidents was merely that of a 'harmless pervert.' " Based upon the above foundation, this Court concludes that the District Court properly "limited the testimony within the

range allowed under Rule 701, M.R.Evid., regarding lay opinions."

¶72 In my view, the officers' testimony as to the predictability of an escalation in severity of sexual offender's actions exceeds the scope of lay witness opinion allowed by Rule 701.

> The question is whether the testimony of the officers is rationally based upon the perceptions of the officers/witnesses within the meaning of Rule 701, M.R.Evid.

¶73 We recently had occasion to apply Rule 701 in Rocky Mountain Ent. v. Pierce Flooring (1997), 286 Mont. 282, 951 P.2d 1326. In *Rocky Mountain*, Black, a shareholder of the corporation, sought to present scientific economic testimony as to his business' future lost profits. Noting that there was no evidence that Black had specialized skill as an economist, we affirmed the district court's refusal to allow Black to predict future lost profits. A nonexpert witness is generally limited to testifying to matters of fact. Walden v. State (1991), 250 Mont. 132, 144, 818 P.2d 1190, 1197. Any lay opinions given must be based upon the witness's own perceptions or helpful to a clear understanding of the witness's testimony or a determination of a fact at issue. Rule 701, M.R.Evid.

*Rocky Mountain, 286 Mont. at 291, 951 P.2d at 1331.*

¶74 In Massman v. City of Helena (1989), 237 Mont. 234, 773 P.2d 1206, we upheld the trial court in its refusal to allow an assistant fire chief, who had not been listed as an expert witness, to testify to the ultimate effect of the fire fighting methods on the containment of the fire. We concluded that his testimony was based upon his technical training and knowledge rather than his personal perceptions:

> As such, the substance of his opinion constituted an expert opinion rather than a lay witness opinion. An expert opinion generally is one "not within the range of ordinary training or intelligence."

*Massman, 237 Mont. at 242, 773 P.2d at 1210.*

¶75 Our decisions in *Rocky Mountain* and *Massman* are consistent with federal decisions interpreting Rule 701, Fed.R.Evid., which has the same "personal perception" requirement as the Montana rule. *See*, *e.g.*, Fireman's Fund Ins. v. Alaskan Pride Partnership (9th Cir. 1997), 106 F.3d 1465, 1468 (insurance claims manager's opinion testimony was admissible because it was based on his own perception and there was no evidence that he

relied on insurance company report); Teen-Ed, Inc. v. Kimball Int'l., Inc. (3rd Cir. 1980), 620 F.2d 399, 404 (accountant was permitted to testify as lay witness based on personal knowledge of balance sheets, but not allowed to answer hypothetical questions unless he was qualified as expert); Sowell v. Butcher & Singer, Inc. (3rd Cir. 1991), 926 F.2d 289, 298-300 (testimony about average prices extrapolated from quarterly reports was properly excluded under Rule 701, Fed.R.Evid., because witness' testimony clearly was based on more than his own perceptions); TLT-Babcock, Inc. v. Emerson Elec. Co. (4th Cir. 1994), 33 F.3d 397, 400 (testimony properly excluded because witness lacked personal knowledge and any information that he had was obtained through reports he received from his staff).

¶76 In the case at hand, Payless, in its opening statement, contended that Payless had been told by the Billings Police, in regard to prior incidents involving Luplow, not to worry because he was a harmless pervert. Onstad contends that Payless's "harmless pervert" theory opened the door to a "Did you say this?" rebuttal. The question is whether Onstad's witnesses went beyond denying the statement and produced what can only be characterized as expert testimony as to the escalation of sex offenses.

¶77 Officer Jason Gartner's testimony on this point was as follows:

> Q. Officer, when we left off last night you had described for us, from Exhibit 23, the facts and some detail of Mrs. Shoemaker--both of the incidents that occurred where she was a victim of sex crime in February of '96, and you were working on the one in May of '97, correct?
>
> A. Yes.
>
> Q. You had told the jury that the incident in May of '97 had been assigned to the special detective unit dealing with sex crimes, such as flashing and the related other crimes, correct?
>
> A. Correct.
>
> Q. Now my question is this, did you ever say to Jennifer Shoemaker that the man that grabbed her and exposed himself to her and masturbated and ejaculated on the carpet in the Payless Store in the Heights in May of '97, was a harmless pervert who would never hurt anyone?

A. Absolutely not.

¶78 As an officer investigating the prior incident he testified that he did not make the "harmless pervert" statement that was attributed to him by Payless. This testimony from Officer Gartner was directly responsive to the issue and was proper rebuttal. His subsequent testimony that "It's well known to all of us these types of things escalate" was objected to as expert testimony and the objection was properly sustained.

¶79 My concern, and the basis for this dissent, is with the testimony of Officer Sandra Leonard, that was presented during Onstad's case-in-chief after an *in camera* discussion in which Onstad argued that a witness can be qualified under Rule 701 through his/her experience and Payless argued that if a witness is "qualified" through experience or education, that witness is an "expert," not a lay witness under Rule 701; that Rule 701 only requires that the witness testify about something in the common experience.

¶80 The relevant portion of Officer Leonard's testimony was as follows:

Q. Let's move on to another subject. I want to lay some foundation for this. In your training and your education and your experience for the Billings Police Department, have you found any correlation between a sex crime that may start as a flashing sex crime, that may advance beyond flashing to some touching or masturbation and sex crime that may advance to an exposure and assault like Katie, and sex crimes going on towards something more serious like very serious bodily harm or murder, have you had experience--have you knowledge about such things because of your position in working in Billings as a police officer? That is my question.

Mr. Speare [Payless's counsel]: Your Honor, we would make the same objection. It's irrelevant to a lay opinion.

Mr. Edwards [Onstad's counsel]: I think this would be a yes or no answer.

The Court: Overruled.

The Witness: Yes.

Q. [by Mr. Edwards]: Would you then describe your experience to this jury, please?

A. My experience, a suspect doesn't decide one day he is going to go out and sexually assault someone. This is something that he has worked up to over and over. You learn it's not about sex. It's a power issue. He was using power here. It's about being in control.

Over and over, as I said, they don't go out and decide one day they are going sexually assault someone. They start by going to the mall and watching victims or potential victims. Maybe touching themselves. Then that is not enough. They graduate to exposing themselves to people. It's a shock value.

In this case, we found, just what had been going on in Billings, that this was escalating. He had been going all over Billings exposing himself or propositioning females. Now all of a sudden that is not enough, and until September of '97, that is what he had been doing. On this night that wasn't enough.

. . . .

Q. Have you had discussions, as part of your training and part of your work in trying to prevent and minimize the damage from these types of crimes, they are foreseeable? They are going to happen, aren't they?

A. Yes, they are.

Q. Sometimes we predict the future by reviewing the past in particular locations?

A. Yes, we do.

MR. SPEAR:  I'm going to object. This is way beyond lay opinion.

Q. [by Mr. Edwards]:  I'm asking you in terms of strictly a lay opinion. I'm talking about your experience and your training and your patrolling the streets for us here in Billings, are you confining all your answers to that?

A. Yes, I am.

Q. My question was, when there are those types of events occurring, it's foreseeable that it's going to happen again in a locale, isn't it?

MR. SPEARE:  I object. Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I would think, yes.

¶81 This testimony goes well beyond responding to the issue of what was said by the Billings Police Department Officers in handling the prior incidents. Officer Leonard offered psychological testimony about sex offenders in general ("they" start out by going to the mall--"they" graduate to exposing themselves). She testified as to what "we found," i.e., the Billings Police Department. Officer Leonard was not testifying as to matters of common knowledge or experience nor was her testimony based upon her personal perceptions as to this incident or this offender. Rather, like the assistant fire chief in *Massman*, she was offering expert testimony based upon her experience and training as a police officer. This testimony clearly exceeded the scope of Rule 701, M.R.Evid., and the District Court abused its discretion in not sustaining Payless's objection.

¶82 Onstad cites to our decision in Hislop v. Cady (1993), 261 Mont. 243, 862 P.2d 388, as authority for allowing Officer Leonard to give opinion testimony under Rule 701. Hislop contended that the trial court erred in allowing Officer Crick to give his opinion as to the cause of the accident in question. Without referencing the Rules of Evidence, this Court noted that Officer Crick had "extensive experience in investigation and was properly qualified through training and experience to testify as to his opinion regarding the cause of the accident." *Hislop*, 261 Mont. at 249, 862 P.2d at 392. Although the Court did not reference the Rules of Evidence, Onstad argues nonetheless that the decision "obviously deals with Rule 701 foundational criteria (perception, experience, assistance to jury on fact in issue)." Onstad reads too much into the *Hislop* decision. The fact that a foundation for the officer's testimony was based upon training and experience and the testimony was for the purpose of assisting the trier of fact would suggest that the officer was an expert under Rule 702 as opposed to a lay witness under Rule 701. It is Rule 702, not 701 which requires that the witness be qualified as an expert by knowledge, skill, experience, training, or education. Rule 701 only requires that the witness testify based upon his personal perception. The *Hislop* decision lends no support to Onstad's contention that Officer Leonard's testimony as to the psychology and predictability of sex offenders falls within the purview of lay testimony under Rule 701, M.R.Evid.

¶83 Officer Leonard's expert testimony went to the heart of Onstad's theory that, given the

expectation that Luplow's "harmless pervert" exhibitions would be expected to escalate to violent conduct, Payless had knowledge of a high probability of harm to Onstad and acted with indifference to that harm. The admission of undisclosed expert testimony from Officer Leonard constitutes prejudicial error and I would reverse.

/S/ W. WILLIAM LEAPHART

Justice Karla M. Gray and Justice James C. Nelson join in the foregoing dissenting opinion.

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON