No. 03-269

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 376

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

JONATHON BLACK,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and for the County of Yellowstone, Cause No. DC 02-0319
                    The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Matthew C. Claus, Attorney at Law, Bozeman, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Mark W. Mattioli,
        Assistant Attorney General, Helena, Montana

        Dennis Paxinos, Yellowstone County Attorney; Scott Twito,
        Deputy County Attorney, Billings, Montana

                    Submitted on Briefs:  November 27, 2003

                    Decided:  December 30, 2003

Filed:

_____
                       Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 A Yellowstone County jury found Jonathon Black guilty of felony conspiracy to commit theft and the Thirteenth Judicial District Court, Yellowstone County, entered judgment against him. Black appeals. We affirm.

¶2 The issues on appeal are whether the District Court erred in concluding the accomplice testimony was corroborated by sufficient independent evidence and whether sufficient evidence established that more than $1,000 was stolen.

BACKGROUND

¶3 On April 18, 2002, the State filed an Information charging Black with felony conspiracy to commit theft. The Information alleged Black had agreed with another to commit a theft of property from the River's Edge Casino and the theft exceeded $1,000.

¶4 Black was tried before a jury in October of 2002. At trial, Yellowstone County Sheriff's Deputy Jim Ellis testified that at about 11:30 p.m. on April 10, 2002, he responded to a dispatch report of a robbery at the River's Edge Casino in Laurel, Montana. Ellis testified he was informed gunshots had been fired during the robbery.

¶5 Ellis further testified that, when he arrived at the casino, Black was standing outside in an open doorway. Black identified himself as a bartender at the casino and said the robbery had occurred at about 11:30 p.m.--after the casino had closed for the evening at 11:00 p.m.--while he was there alone doing paperwork and cleaning up. Black told Ellis the male robber wore a ski mask, fired a gun twice, and took less than $2,000 in currency.

2

¶6    Ellis found a broken liquor bottle and two bullet holes behind the bar where Black reported he was standing when the robber confronted him. Ellis also found a broken window in the dining area of the casino and a river rock and a brick on the floor which he surmised had been thrown through the window. After examining the scene, however, Ellis did not believe anyone had entered the casino through the broken window. Ellis considered it suspicious that Black reported not having heard the window breaking and was standing outside in the open so shortly after reporting being shot at in a robbery.

¶7    Detective Seth Weston testified that he questioned Black at the casino. Black told Weston that upon encountering the robber, he went to the cash register and removed the money, put the money in a bag and threw the bag at the robber across the bar. Black told Weston he then laid down behind the bar and curled up until after the robber left.

¶8    According to Weston, Black stated he did not have much money and never carried much cash. Black also told Weston that his girlfriend, Christy, had been in the bar that evening with her sister Heather and a man Black claimed not to know, and that they had left the casino at about 11:00 p.m. Weston testified that, after he left the casino, he went to the home where Christy and Black lived. There, he recovered a bundle of $406 in cash from the glove compartment of Christy's car.

¶9    Sharon Turbiville, the casino's owner, testified by videotaped deposition that Black had been employed at the casino for about two weeks before April 10. She also testified that he had questioned her about the video surveillance cameras in the casino a few days before

3

April 10, and recalled having told him the cameras were not operating because she had taken them home to record two of her horses foaling.

¶10     Black called Turbiville after reporting the robbery, and she went to the casino. Based on calculations she made that night, Turbiville estimated $1,270 was taken from the casino. She admitted on cross-examination that she was not sure of the amount of money in the till at the beginning of Black's shift because, shortly before or after the date of the robbery, she had increased the amount of money routinely placed in the bartender's till at the start of each afternoon shift.

¶11     Dana Huber, Turbiville's daughter, testified she worked as a cook in the casino's restaurant and also had managerial responsibilities. According to Huber, Black's girlfriend Christy usually came into the casino on the nights Black worked. Huber said that on the night of the robbery, Christy, Heather and a young man later identified as Heather's boyfriend, Sundance, showed up at the casino. When Huber asked Black to have them leave, he told her they had just wrecked the new car Heather's father had given her and Heather needed to use the telephone. Huber went out into the parking lot and looked at the car, where Heather told her she was afraid of her father's reaction to the news about the car. Christy told Huber they wanted to take the car home and have a friend of Sundance's fix it before Heather's dad found out about the wreck.

¶12     Huber, who left the casino a little before 10:00 p.m. on April 10, also testified that she returned to the casino after Turbiville called to tell her it had been robbed. It appeared to Huber that Black had not done any cleaning--the ashtrays around the machines were dirty

4

and chairs were in disarray, not pushed in to the machines as they would have been after vacuuming was done. In her opinion, Black should have been done with his cleaning and out of the casino by 11:30 p.m., when he reported the robbery occurred. Huber also testified that, based on calculations she made that night with her mother and Julie Paul, a waitress at the casino, around $1,300 was taken from the cash register. She stated the casino's practice was to start the afternoon bartender's cash register with $1,500--which was increased to $2,000 sometime near April 10--in five dollar bills and about $100 in ones, quarters and nickels.

¶13   Julie Paul testified she worked as a waitress at the casino on April 10, 2002. While working, she heard Christy, Heather, Sundance and Black--who all appeared to know each other fairly well and were talking like friends--talking about the rollover of Heather's car and the associated damage. Paul testified that Christy, Heather and Sundance seemed nervous and it appeared Black was trying to help them figure out what to do about the situation.

¶14   Detective Sam Bofto testified that Black was detained at the Yellowstone County Detention Facility, where $343.72 was found on his person. Bofto also reported that, early on the morning after the robbery, he went with other officers to Heather and Sundance's residence. When they knocked on the door, Heather and Sundance escaped through a bathroom window and fled on foot. An officer quickly tackled Heather, but Sundance eluded immediate capture by swimming across the frigid Yellowstone River. He was apprehended later that day.

¶15   Weston recovered $370 in $5 and $1 bills from Heather. He also recovered a ski mask and a bundle of receipts from the casino dated April 10, 2002, from Heather and Sundance's bedroom.

¶16   Sundance testified he was 19 years old and had known Heather, Christy and Black for "years." He testified that on the evening of April 10, he rolled Heather's new car, but it was still driveable. Afterward, he and Heather borrowed Christy's car. They went to the casino to meet Christy and return her car to her.

¶17   According to Sundance, he originally estimated it would take $1,500 to fix Heather's car. While he, Christy and Heather were talking with Black at the casino, they came up with the idea of robbing the casino to get money to fix the car. Sundance testified he and Black planned that he would wait until everyone but Black had left the casino for the night and then break in through a window and fire two shots from his gun. Sundance said Black told him there was $1,300 to $1,500 in the cash register and not to worry about security cameras because there were no security cameras there.

¶18   Sundance testified that he gave Christy $400 of the stolen money for her and Black. He further testified he had about $150 from the robbery in his back pants pocket when he jumped into the Yellowstone River, but the money was no longer in his pocket when he got out on the other side of the river.

¶19   Heather, age 17, and Christy, age 21, both testified consistently with Sundance concerning the wreck and the subsequent events, including the development of a plan to rob the casino. Christy testified Black was her boyfriend and she and Black had hosted Heather

6

and Sundance at their home. She also testified that, after the "robbery," she gave Sundance a ride home, where he gave her some of the money from the casino.

¶20 At the close of the evidence, the jury found Black guilty of conspiracy to commit felony theft. The District Court entered judgment and Black appeals.

## DISCUSSION

¶21 1. Was the accomplice testimony corroborated by sufficient independent evidence?

¶22 A criminal defendant may not be found guilty of an offense based on the testimony of another person responsible or legally accountable for the same offense unless the other person's testimony is corroborated by other evidence which, in itself and without the aid of the other person's testimony, tends to connect the defendant with the commission of the offense. Section 46-16-213, MCA. The sufficiency of evidence to corroborate the testimony of an accomplice is a question of law. *State v. Fey*, 2000 MT 211, ¶ 5, 301 Mont. 28, ¶ 5, 7 P.3d 358, ¶ 5. We review a district court's conclusion of law to determine whether it is correct. *State v. Bales*, 1999 MT 334, ¶ 43, 297 Mont. 402, ¶ 43, 994 P.2d 17, ¶ 43.

¶23 Black contends the testimony of Sundance, Heather and Christy was not sufficiently corroborated for purposes of § 46-16-213, MCA, and this Court's precedent. Specifically, he contends the State offered no evidence of facts to connect him to the crime or that the connection was made only through bootstrapping from the accomplice testimony. He then lists specific portions of accomplice testimony which he contends were not corroborated.

7

¶24    Corroborating evidence need not extend to every fact to which the accomplice testifies. *State v. Ungaretti* (1989), 239 Mont. 314, 318, 779 P.2d 923, 925. We have elaborated the test for sufficiency of corroborating evidence:

> To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. Corroborating evidence may be circumstantial and can come from the defendant or his witnesses.

*State v. Kemp* (1979), 182 Mont. 383, 387, 597 P.2d 96, 99 (citations omitted). Corroborating evidence is not insufficient just because it is circumstantial, disputed or even possibly consistent with innocent conduct; it is up to the jury to resolve such factual questions. *State v. Kaczmarek* (1990), 243 Mont. 456, 460, 795 P.2d 439, 442 (citation omitted).

¶25    Black points out that, in *Kemp*, 182 Mont. at 387, 597 P.2d at 99, we said each case must be examined on its particular facts to determine if the corroborating evidence tends, in and of itself, to prove the defendant is connected with the crime charged.

¶26    Setting aside the testimony of Black's accomplices entirely, the jury in the present case heard evidence that Black had told Weston he did not have much money and never carried much cash, but he had $343 on him when he was taken into custody. The jury also heard testimony indicating Black lied when he told Weston he had been cleaning the bar after closing and did not know Sundance. In addition, the jury heard evidence that the accomplices were at the casino visiting with Black that evening about their need for money to repair Heather's car, that it appeared Black was trying to help them figure out what to do

8

about the situation, and that the accomplices were the last people in the casino with Black that evening. The State presented testimony that Black knew the surveillance cameras were not working and that the entry of a robber through the window was suspicious. Ellis testified that Black was standing outside the casino in the open shortly after having called the police and reported being shot at. Testimony from several nonaccomplice witnesses, when pieced together, established that the total cash confiscated from Black, Christy's car and Heather approximated the amount Turbiville and Huber calculated was stolen from the casino.

¶27    We hold, as a matter of law, that the District Court correctly concluded the accomplice testimony was corroborated by sufficient independent evidence to be submitted to the jury.

¶28    2. Did sufficient evidence establish that more than $1,000 was taken from the casino?

¶29    The value of the property taken in a felony theft case is an essential element of the offense which the State must prove beyond a reasonable doubt. *State v. Pitzer*, 2002 MT 82, ¶ 7, 309 Mont. 285, ¶ 7, 46 P.3d 582, ¶ 7 (citation omitted). When the defendant challenges the sufficiency of the evidence to support the conviction, the applicable standard of review is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Pitzer*, ¶ 8 (citation omitted).

¶30    Black argues that because of Turbiville's and Huber's uncertainty about the amount of money in the afternoon bartender's starting till on April 10, 2002, it is impossible to determine the amount of money taken from the casino.

9

¶31 Turbiville and Huber testified the amount stolen was approximately $1,270 and $1,300, respectively. Their testimony was based on calculations they made the night the money was taken. Neither the State nor Black presented evidence that a lesser amount of money was taken. Moreover, the amounts calculated by Turbiville and Huber were nearly duplicated by the cash retrieved from Black, Heather, and Christy's car, taken together with the $150 Sundance testified was lost in the murky depths of the Yellowstone River.

¶32 Viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have found sufficient evidence to establish, beyond a reasonable doubt, that more than $1,000 was taken from the casino. Therefore, we hold that sufficient evidence established that more than $1,000 was taken from the casino.

¶33 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA COTTER