DA 06-0092

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 202

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

JOSHUA JACE DEWITZ,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2005-046
Honorable John W. Larson, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

          Russell LaFontaine, Office of the Public Defender, Missoula, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, Micheal S. Wellenstein, Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney, Jennifer Clark, Deputy County Attorney, Missoula, Montana


Submitted on Briefs:  May 2, 2007

Decided:  June 9, 2009


Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Joshua Dewitz appeals a jury verdict in the District Court for the Fourth Judicial District, Missoula County, finding him guilty of felony Operation of a Clandestine Lab and felony Criminal Endangerment. We affirm.

¶2     Dewitz raised several issues and sub-issues on appeal which we have restated for clarity as follows:

¶3     1. Did the District Court abuse its discretion when it denied Dewitz's motion to excuse a prospective juror for cause?

¶4     2. Did the District Court abuse its discretion in allowing an officer to testify regarding handwriting samples?

¶5     3. Did the District Court err in allowing an officer to testify regarding statements made by witnesses at the scene?

¶6     4. Did Dewitz waive appellate review of his M. R. Evid. 404(b) claim by his failure to make a timely objection?

¶7     5. Did the District Court abuse its discretion when it refused to instruct the jury that Ashley was an accomplice as a matter of law?

¶8     6. Did the District Court err in denying Dewitz's motion to dismiss for insufficient evidence?[1]

¶9     7. Did the prosecutor commit misconduct in her closing argument to the jury?

---

[1] Dewitz filed what he termed a "motion for a directed verdict"; however, there is no statutory authority for such a motion. The correct motion is a motion to dismiss for insufficient evidence, *see* § 46-16-403, MCA, and we will refer to Dewitz's motion in this case as such.

**Factual and Procedural Background**

¶10 Dewitz and Tanisha Ashley had an 8-year-long relationship that began when Ashley was 16 years old. They had a daughter, Jasmyne, when Ashley was 17. Although their relationship ended, Dewitz and Ashley maintained contact so that Dewitz could continue to see Jasmyne.

¶11 In June 2004, Ashley decided to move from Virginia to Oregon where she grew up and where she still had family. Dewitz agreed to help her move. In August 2004, Dewitz, Ashley and Mia, Ashley's infant daughter from a different relationship, left for Oregon by car. They drove a white, four-door, older car, possibly a Subaru. Jasmyne remained in Iowa with Dewitz's family until Ashley was settled in Oregon.

¶12 Dewitz and Ashley arrived in Missoula on the evening of August 17, 2004. They decided to stay overnight in Missoula, hence Ashley rented two rooms at the Microtel Motel. Ashley later testified that she rented the rooms because Dewitz did not have any identification. The rooms were side by side. Ashley and her baby stayed in room 332 and Dewitz stayed in room 330. Ashley testified that the only time she was in room 330 was when they arrived and she carried Dewitz's cat to that room before going to her own room with Mia.

¶13 Ashley further testified that sometime after she went to sleep, she was awakened by Dewitz screaming her name and banging on her door. When Ashley opened the door, Dewitz rushed past her, grabbed his briefcase and told her to get the baby because they had to go. Ashley noticed that Dewitz had burn blisters on his arms and chest. Ashley grabbed Mia and whatever else she could and ran out to the car where Dewitz was

3

waiting. She noticed a lot of smoke coming out of the motel windows. Ashley asked Dewitz about his cat and Dewitz told her it was dead.

¶14 Dewitz drove toward the interstate. On their way out of town, Ashley asked Dewitz what happened and he told her "a fire." Ashley told Dewitz that he had to take her back because the rooms were in her name. Dewitz turned the vehicle around and dropped Ashley and Mia off at a gas station. Dewitz told Ashley he could not stay because there was a warrant out for his arrest. Ashley returned to the motel with Mia and told the desk clerk what had happened.

¶15 The Missoula Fire Department responded to the fire and evacuated the motel. When the firefighters initially entered the burning room, the sprinkler system was spraying water, but a pot on the floor was still burning. The firefighters used a chemical fire extinguisher to put out the fire in the pot and also rescued Dewitz's cat from the room.

¶16 Fire Inspector Jason Diehl conducted the investigation of the fire in room 330. He determined that the fire started when wind from the open window blew the curtains into a hot plate that was sitting on a counter below the window causing the curtains to ignite. The fire from the curtains then ignited the flammable vapors emitting from a pot in the room. Diehl believed that the flaming pot of chemicals ended up on the floor when the occupant of the room moved it away from the curtains in an attempt to extinguish the blaze. Diehl testified that from the objects he observed in the room and from the way the fire started, it appeared to him that someone had set up a meth lab in the room

4

endangering not only the motel occupants, but also the firefighters who responded to the fire. The fire caused over $270,000 in damages to the motel.

¶17 As part of his investigation, Diehl interviewed Ashley. In that interview, Ashley told Diehl that she and her daughter were staying in room 332 and Dewitz was staying in room 330. Ashley later testified that at some point during the evening, Dewitz told her he was heading to WalMart. Ashley said that she remained in her room all night scratching lottery tickets until she fell asleep. She did not wake up until she heard Dewitz banging on the door and screaming her name.

¶18 Ashley gave law enforcement officers permission to search both rooms. In room 332, the officers found baby bottles, formula, diapers, feminine items, and a bottle of medication. Detective Scott Brodie with the Missoula Police Department testified that all of these items indicated that Ashley was staying in room 332. In the bathroom of room 332, the officers also found a snort tube and a piece of burnt tin foil. Residue from these items later tested positive for meth.

¶19 When officers searched room 330, they found a number of items associated with the making of meth including Epsom salts, Isopropyl alcohol, STP gas treatment, tubing, a funnel, rubber gloves, lithium batteries, a digital scale, duct tape, a gas mask, various bottles of liquid, and a pot of a tri-layered amber liquid. Tests by the crime lab revealed that the upper layer of this liquid was meth. Officers also found in the room a wallet containing $5,000 wrapped in black electrical tape; two spiral notebooks containing laundry lists of things to buy and do; a man's toiletry bag containing a toothbrush and

5

shaving gear; and a bag of catnip. Detective Brodie testified that these items indicated that Dewitz was staying in that room.

¶20 Ashley was arrested and charged with Criminal Endangerment for exposing two-month old Mia to meth, Criminal Possession of Dangerous Drugs, Criminal Possession of Drug Paraphernalia, and Operation of an Unlawful Clandestine Lab. Mia was placed in the care of Child & Family Services. An examination showed that Mia had methamphetamine and amphetamine in her system.

¶21 On June 6, 2005, the State and Ashley entered into a plea agreement wherein the State agreed that the charges of Criminal Endangerment and Operation of an Unlawful Clandestine Lab would be dismissed at sentencing. Ashley agreed to plead guilty to Criminal Possession of Dangerous Drugs and Criminal Possession of Drug Paraphernalia, and to testify truthfully in any proceeding stemming from the incident at the motel. The State also agreed to recommend a five-year commitment to the Department of Corrections with all but one year suspended and a $4,000 fine for the Offense of Criminal Possession of Dangerous Drugs, along with a six-month sentence to the Missoula County Detention Center for the offense of Criminal Possession of Drug Paraphernalia.

¶22 Dewitz was arrested in Oregon on September 21, 2004, and returned to Montana for trial. The State charged Dewitz with Operation of an Unlawful Clandestine Lab, a felony, in violation of § 45-9-132, MCA, and Criminal Endangerment, a felony, in violation of § 45-5-207, MCA. A jury found Dewitz guilty of both offenses on June 29, 2005. For the offense of Operation of an Unlawful Clandestine Lab, Dewitz was sentenced to prison for forty years with twenty years suspended. He was sentenced to an

6

additional ten years for the offense of Criminal Endangerment, to run concurrently to the first sentence.

¶23 Dewitz appeals.

**Issue 1.**

¶24 *Did the District Court abuse its discretion when it denied Dewitz's motion to excuse a prospective juror for cause?*

¶25 The District Court denied defense counsel's request to strike prospective juror Chari Lipski for cause. Lipski is employed as a 911 dispatcher and her significant other is a city police officer. During voir dire, Lipski stated that she may have been working at the time of the incident and that she remembered the fire "being discussed" among her coworkers. Defense counsel requested that she be removed for cause because she was a potential witness and because she may have outside knowledge of the incident that could come into play during deliberations. The State objected to Lipski's dismissal and the District Court denied defense counsel's request to strike this juror for cause. Consequently, counsel used one of his preemptory challenges to remove her from the jury.

¶26 Dewitz argues on appeal that the District Court's failure to dismiss Lipski denied him his right to a fair trial. He contends that because Lipski is employed "by the entity on whose behalf the prosecution was initiated," Lipski should have been dismissed for cause. Dewitz also contends that because Lipski is a 911 dispatcher and is in a relationship with a law enforcement officer, she is "prone to favor" the State's side of this case. And, finally, Dewitz contends that because Lipski heard some of her co-workers

7

discussing this incident at the time it occurred, Lipski was a potential witness, thus she could not serve as a juror in this case.

¶27 The State argues that the mere fact that Lipski has connections to law enforcement does not, without more, necessitate a finding of bias. The State also argues that Dewitz's claim that Lipski should have been excused because she could be a potential witness in this case is unfounded.

¶28 We review a district court's denial of a challenge for cause to determine if the court abused its discretion. *State v. Golie*, 2006 MT 91, ¶ 6, 332 Mont. 69, 134 P.3d 95 (citing *State v. Marble*, 2005 MT 208, ¶ 10, 328 Mont. 223, 119 P.3d 88). An abuse of discretion occurs if a trial court fails to excuse a prospective juror when actual bias is discovered during voir dire. *State v. Richeson*, 2004 MT 113, ¶ 16, 321 Mont. 126, 89 P.3d 958 (citing *State v. Freshment*, 2002 MT 61, ¶ 12, 309 Mont. 154, 43 P.3d 968). "Because of the right to a trial by an impartial jury [Mont. Const., art II, § 24], and the great expense and inconvenience that results from retrial, dismissal for cause is favored when a serious question arises about a juror's ability to be impartial." *Richeson*, ¶ 14 (citing *Freshment*, ¶ 11).

¶29 Section 46-16-115(2), MCA, sets forth the bases for challenging potential jurors for cause in criminal cases. Dewitz contends on appeal that § 46-16-115(2)(b), MCA, in particular applies to this case. Section 46-16-115(2)(b), MCA, provides in relevant part:

> (2) A challenge for cause may be taken for all or any of the following reasons or for any other reason that the court determines:
>
> . . .

(b)   standing in the relation of guardian and ward, attorney and client, master and servant, landlord and tenant, or debtor and creditor with or being a member of the family *or in the employment of* the defendant or the person who is alleged to be injured by the offense charged or *on whose complaint the prosecution was instituted*; . . . [Emphasis added.]

Thus, Dewitz argues that under this statute, Lipski should have been dismissed for cause because she was employed as a 911 dispatcher.   However, Dewitz did not argue this theory in the trial court.

¶30   It is a well-established rule that this Court will not address an issue raised for the first time on appeal or a party's change in legal theory because it is unfair to fault the trial court on an issue it never had the opportunity to consider.  *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, 44 P.3d 499 (citing *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, 989 P.2d 836).  Because Dewitz did not raise a challenge to Lipski under this statute during voir dire, we will not address this issue under this new legal theory on appeal.

¶31   Dewitz also contends that because Lipski is a 911 dispatcher and is in a relationship with a law enforcement officer, she is "prone to favor" the State's side of this case.  However, the following discussion occurred during the voir dire examination of Lipski:

> THE COURT:  So are those witnesses so close to either you or you know they're close to your significant other that you don't feel you can process the evidence fairly and impartially in this case?
> JUROR LIPSKI:  I don't think that it would – would affect the way that I looked at this but I am a 911 dispatcher and I also do call in city police tests so --
> THE COURT:  Right.  Is that going to – again are you able to set your job aside and be a juror and just listen to this testimony here and follow the law and then you find the facts and get to a verdict?

9

JUROR LIPSKI:  I believe so.

.   .   .

MS. CLARK [for the State]:   Ms. Lipski, you don't specifically recall if you were working that morning or not.

JUROR LIPSKI:  I don't.

MS. CLARK:  Any of the things that you heard about this offense, either from co-workers or from working, have you formed an opinion about the case as of now?

JUROR LIPSKI:  No.

MS. CLARK:  Would you be able to listen objectively to both sides and make a determination at the end of Mr. Dewitz's guilt?

JUROR LIPSKI:  I believe so.

MS. CLARK:  And does the fact that you are a dispatcher in a relationship with an officer and work at the city police department have a bearing on how you would weigh the evidence in this case?

JUROR LIPSKI:  I don't believe so.

MS. CLARK:  I object to her dismissal.

THE COURT:  Any additional questions?

MR. LAFONTAINE [counsel for Dewitz]: Yes, Judge.  Ms. Lipski, as you stated to one of Ms. Clark's questions, you don't – you don't remember – you don't recall exactly whether you worked that night or not, correct?

JUROR LIPSKI:  Right.  I would have to check my shift schedule.

MR. LAFONTAINE:  Okay.  And you did state to the judge that you could sit here and listen to all the evidence and be a fair and impartial juror; is that correct?

JUROR LIPSKI:  I do believe so.

MR. LAFONTAINE:  Okay.  And do you believe – if you heard all of the state's witnesses, you heard all of the – you heard certain police officers, fire marshals, and possibly an evidence examiner get up here and testify, if you heard whatever evidence the defense has to put on and if you feel that the state didn't prove their case, could you enter a not guilty verdict?

JUROR LIPSKI:  I believe I could and do what was proper.

MR. LAFONTAINE:  And – and the fact that someone's sitting next to a defense attorney at a criminal trial you don't automatically believe that that person's guilty, do you?

JUROR LIPSKI:  No, sir.

MR. LAFONTAINE:  Judge, she did answer the questions that – that I asked, I believe, truthfully, Judge.  However, as stated earlier, the main reason for this is that this – this potential juror could – could have been

10

called as a – as a – as a witness by the state if the state so chose because she has prior knowledge of this offense and – and that may – that – I believe, Judge, that may – that may come into bearing during deliberation.

THE COURT: Very well. Your motion is denied.

¶32 Thus, contrary to Dewitz's contention, the preceding colloquy shows that Lipski was not biased in this case. Lipski consistently responded that she would listen to the evidence objectively, that she could remain impartial, and that her job in law enforcement and her personal relationship with a law enforcement officer would not have a bearing on how she weighed the evidence. There exists nothing in Lipski's testimony demonstrating that she had formed an opinion on Dewitz's guilt or innocence, or that her employment and personal relationship would cause Lipski to harbor any actual bias one way or the other.

¶33 In addition, the mere fact that Lipski is connected to law enforcement through her job and her personal relationship does not, without more, necessitate a finding that she would not be an impartial juror. *State v. Deschon*, 2004 MT 32, ¶ 41, 320 Mont. 1, 85 P.3d 756 (citing *State v. Thomson*, 169 Mont. 158, 163, 545 P.2d 1070, 1072-73 (1976)).

¶34 Dewitz also contends that because Lipski heard some of her co-workers discussing this incident at the time it occurred, Lipski was a potential witness and, pursuant to M. R. Evid. 606(a), jurors are prohibited from acting as witnesses at trial. However, Lipski was not listed as a witness by the State or the defense prior to trial, and Lipski never testified at trial. Thus, Dewitz's claim that Lipski should have been excused because she could be a potential witness is unfounded. In addition, Dewitz's claim that Lipski could have tainted the jury with information or facts that may not have been

11

submitted at trial was pure speculation. Discussing the case with her co-workers and remembering a "brief generalization" of what occurred does not prove that Lipski was exposed to information that was inadmissible at trial.

¶35 Accordingly, we hold that the District Court did not abuse its discretion when it denied Dewitz's motion to excuse Lipski for cause, and we affirm on this issue.

**Issue 2.**

¶36 *Did the District Court abuse its discretion in allowing an officer to testify regarding handwriting samples?*

¶37 Detective Brodie testified that in the course of his investigation, he found two spiral notebooks inside a red bag in room 330 containing, among other things, "to do" lists. Detective Brodie testified that some of the items found in the room were on the lists. Detective Brodie further testified that he compared the handwriting in the notebooks to the handwriting in several letters that had been seized from Ashley while she was incarcerated in the Missoula County Detention Center. While acknowledging that he was not an expert, Detective Brodie opined that the handwriting in the notebooks was the same as the handwriting in the letters. Detective Brodie informed the jury that he believed the letters were from Dewitz because the return address indicated they were from a "Jill Delle," but at least one of them was signed, "Your man, J.D."

¶38 Dewitz argued in the trial court and now on appeal that the State did not lay the proper foundation to have Detective Brodie qualified as an expert in handwriting analysis. Dewitz also argues that the District Court abused its discretion when it allowed

12

Detective Brodie to give opinion testimony that the handwriting on the letters was the same as the handwriting in the notebooks.

¶39    The State argues, on the other hand, that Detective Brodie was not testifying as an expert witness because his testimony was not scientific or technical, and it did not require specialized knowledge or training. Instead, the State maintains that Brodie was testifying as a lay witness and "simply offering his personal observation that [the] handwriting in the letters and notebooks was the same, an observation that any lay witness could have made."

¶40    We review a district court's evidentiary rulings to determine whether the court abused its discretion. *State v. Frasure*, 2004 MT 305, ¶ 15, 323 Mont. 479, 100 P.3d 1013. In addition, we have repeatedly held that law enforcement officers may testify to matters about which "they have extensive experience and are properly qualified through training and experience." *Frasure*, ¶ 17 (citing *Onstad v. Payless Shoesource*, 2000 MT 230, ¶ 40, 301 Mont. 259, 9 P.3d 38, *overruled in part by Johnson v. Costco Wholesale*, 2007 MT 43, 336 Mont. 105, 152 P.3d 727). However, in the case *sub judice*, we agree with Dewitz that Detective Brodie was giving expert testimony on handwriting comparisons even though he was not a handwriting expert.

¶41    We have found only one case wherein this Court has allowed testimony comparing handwriting from someone other than a handwriting expert, and the reason we allowed such testimony in that case was because the person testifying had established a familiarity with the defendant's handwriting long before defendant's alleged misconduct occurred. In *State v. Fleming*, 225 Mont. 48, 730 P.2d 1178 (1987), a case involving the issuing of

13

bad checks, the managing officer and executive vice president of a bank handling the checks at issue was allowed to render his opinion as to the author of those checks. We pointed out in *Fleming* that the bank official's familiarity with the defendant's signature was gained through having known the defendant since birth, his personal contact with the defendant at the bank, and his review of the defendant's signature card on file at the bank. *Fleming*, 225 Mont. at 52, 730 P.2d at 1180-81. In addition, the bank official stated that comparing signature cards with the signatures on checks was part of his job at the bank. *Fleming*, 225 Mont. at 52, 730 P.2d at 1180-81.

¶42 We relied in *Fleming* on M. R. Evid. 901, which provides that a nonexpert may give an opinion on the genuineness of handwriting only if the nonexpert is already familiar with that handwriting. *Fleming*, 225 Mont. at 51-52, 730 P.2d at 1180-81.

> **Requirement of authentication or identification.**
> (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
> (b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
>
> .  .  .
>
> (2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, *based upon familiarity not acquired for purposes of litigation.*

M. R. Evid. 901 (emphasis added). Here, Detective Brodie had no familiarity with Dewitz's handwriting prior to the investigation in this case.

¶43    Accordingly, we hold that the District Court abused its discretion in allowing Detective Brodie, a lay witness, to give opinion testimony regarding the handwriting samples in this case.

¶44    Nevertheless, we also hold that this error was harmless. We have adopted a two-step analysis to determine whether an alleged error prejudiced a criminal defendant's right to a fair trial and is therefore reversible. *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735. The first step in the analysis is to categorize the claimed error as "structural" error or "trial" error. *Van Kirk*, ¶ 37. " 'Structural' error is that type of error that '[a]ffects the framework within which the trial proceeds, rather than simply an error in the trial process itself,' " *Van Kirk*, ¶ 38, whereas "trial" error "is that type of error that typically occurs during the presentation of a case to the jury," *Van Kirk*, ¶ 40. We further defined "structural" error as error that is

> typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding. Because of its nature, it cannot be qualitatively or quantitatively weighed against the admissible evidence introduced at trial. Structural error is presumptively prejudicial and is not subject to harmless error review jurisprudentially or under our harmless error statute found at § 46-20-701, MCA.
> Structural error is automatically reversible and requires no additional analysis or review.

*Van Kirk*, ¶¶ 38-39 (citing *State v. LaMere*, 2000 MT 45, 298 Mont. 358, 2 P.3d 204 (errors in the jury selection process are structural errors); *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963) (total deprivation of the right to counsel is a structural error); *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437 (1927) (lack of an impartial trial judge is a structural error)). Conversely, we defined "trial" error as error that is

amenable to qualitative assessment by a reviewing court for prejudicial impact relative to the other evidence introduced at trial. Trial error is not presumptively prejudicial and therefore not automatically reversible, and is subject to review under our harmless error statute, § 46-20-701(1), MCA.

*Van Kirk*, ¶ 40. In the case *sub judice*, the error is clearly "trial" error as it occurred during the presentation of the case to the jury, *Van Kirk*, ¶ 40, but it did not undermine the fairness of the entire trial proceeding, *Van Kirk*, ¶ 38.

¶45   Because we have determined that the error in this case was "trial" error, the next step in the analysis is to determine whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41. Consequently, we must look "to whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43 (emphasis omitted). In other words, in the instant case, the State must have presented other evidence to show that Dewitz was occupying the room containing the meth lab that caught on fire.

¶46   To that end, the State presented Ashley's testimony that Dewitz occupied that room; a booking photo of Dewitz from Oregon indicating that he had been burned in the fire in that room; a photograph of Dewitz's and Ashley's daughter found in that room; and Julia Menendez's testimony that on the night of the fire, Dewitz called her and told her he had been burned in a fire at the motel. This evidence was sufficient to prove the same facts as the tainted evidence was intended to prove—i.e., that Dewitz occupied the room containing the meth lab.

¶47    Therefore, on the basis of this other admissible evidence, we conclude that the introduction of Detective Brodie's opinions regarding the handwriting in the notebooks was harmless, and Dewitz's right to a fair trial was not prejudiced.

**Issue 3.**

¶48    *Did the District Court err in allowing an officer to testify regarding statements made by witnesses at the scene?*

¶49    While we review a district court's evidentiary decisions to determine if the court abused its discretion, we review a court's conclusions of law and interpretations of the United States Constitution de novo. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458, *cert. denied*, 549 U.S. 810, 127 S. Ct. 43 (2006) (citations omitted).

¶50    Dewitz argues on appeal that the District Court erred when it allowed the State to elicit testimony from Missoula Police Officer Connie Brueckner that witnesses at the scene told her that they saw a black woman and a white male leave the motel shortly after the fire alarm sounded. Dewitz argues on appeal that this statement is inadmissible under M. R. Evid. 802, and that allowing this statement into evidence violated his rights under the Confrontation Clause as the witnesses were not available for cross-examination.

¶51    The Confrontation Clause of the Sixth Amendment to the United States Constitution allows courts to admit hearsay against criminal defendants in only two instances: (1) if the hearsay is testimonial, the defendant must have had an opportunity to cross-examine the declarant and the prosecution must show that the declarant is unavailable to appear at trial, or (2) if the hearsay is nontestimonial, the hearsay must bear adequate indicia of reliability or particularized guarantees of trustworthiness.

17

*Mizenko*, ¶ 10 (citing *Crawford v. Washington*, 541 U.S. 36, 59, 68, 124 S. Ct. 1354, 1369, 1374 (2004)).

¶52   During cross-examination of Ashley, defense counsel introduced the "Affidavit and Motion for Leave to File Amended Information" from the State's case filed against Ashley.  The affidavit and motion stated in part:  "Witnesses stated that shortly after the fire alarm sounded, they observed a black female and a white male get into a Subaru and leave.  One witness identified Ashley as the woman who had left."  The State later elicited testimony from Officer Brueckner that, during her investigation, witnesses told her that two people and an infant had left the scene.  Over defense counsel's objection, the court allowed Officer Brueckner to read from the affidavit and motion that had been previously introduced by defense counsel.  In addition, the State argued in closing:

> How do we know that it was [Dewitz] that did this?  We have other witnesses that were there, and they told the officers that they saw two people fleeing the scene in a white car: a Black female and a White male.

¶53   This Court has repeatedly held that a party waives the right to allege error on appeal where objectionable evidence or testimony was elicited by that party's own actions.  *State v. Smith*, 2005 MT 18, ¶ 10, 325 Mont. 374, 106 P.3d 553 (citing *State v. Gardner*, 2003 MT 338, ¶¶ 44, 47, 318 Mont. 436, 80 P.3d 1262, *cert. denied*, 541 U.S. 1034, 124 S. Ct. 2105 (2004)); *see also State v. Harris*, 1999 MT 115, ¶¶ 32-33, 294 Mont. 397, 983 P.2d 881 ("We will not put a district court in error for an action in which the appealing party acquiesced or actively participated.").

¶54     In this case, Dewitz opened the door by introducing the affidavit and motion from which Officer Brueckner read. Dewitz cannot now challenge Officer Brueckner's testimony since Dewitz himself introduced the evidence that he now finds objectionable.

¶55     Accordingly, we hold that the District Court did not err in allowing Officer Brueckner to testify regarding statements made by witnesses at the scene, and we affirm on this issue.

**Issue 4.**

¶56     *Did Dewitz waive appellate review of his M. R. Evid. 404(b) claim by his failure to make a timely objection?*

¶57     M. R. Evid 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

We review a district court's ruling regarding the admission of evidence of other crimes, wrongs or acts under M. R. Evid. 404(b) to determine whether the court abused its discretion. *State v. Buck*, 2006 MT 81, ¶ 71, 331 Mont. 517, 134 P.3d 53 (citing *State v. Aakre*, 2002 MT 101, ¶ 8, 309 Mont. 403, 46 P.3d 648).

¶58     In the case *sub judice*, Ashley testified, in response to questioning from the State, that both she and Dewitz would use meth when they got together. She also testified that the time period she was referring to when they both used meth was at least eight months prior to this incident. Dewitz did not object to this testimony from Ashley, and, instead, waited until after Ashley had finished testifying to move for a mistrial. The motion was

based in part on the grounds that Ashley's testimony regarding their meth use was inadmissible because it referred to prior bad acts when the State had not given proper notice that it intended to introduce such information. The District Court denied Dewitz's motion for a mistrial.

¶59 We review a district court's grant or denial of a motion for a mistrial to determine whether the court abused it discretion. *Smith*, ¶ 6 (citing *State v. Weldele*, 2003 MT 117, ¶ 72, 315 Mont. 452, 69 P.3d 1162). We noted in *Smith*, that, generally, a mistrial is appropriate where there is a reasonable possibility that inadmissible evidence may have contributed to a defendant's conviction. *Smith*, ¶ 8 (citing *State v. Partin*, 287 Mont. 12, 18, 951 P.2d 1002, 1005 (1997)).

¶60 Dewitz argues on appeal that the State did not provide notice that it intended to present evidence of prior bad acts and that evidence of past meth use was irrelevant to the meth lab charges and highly prejudicial to his case. He contends that the evidence had no probative value and was too remote in time to be considered relevant to this incident.

¶61 The State argues on the other hand that Dewitz waived appellate review of this issue because he never made a contemporaneous 404(b) objection during Ashley's testimony even though the grounds for the objection were apparent at the time. The State maintains that raising a 404(b) argument in a motion for a mistrial is too late.

¶62 To preserve an issue for appeal, a defendant must make an objection when the evidence is offered. " '[O]ne must object to improper testimony when it is offered or abide the result; failure to object at the proper times waives the error.' " *State v. Lawrence*, 285 Mont. 140, 163, 948 P.2d 186, 200 (1997) (quoting *Labbitt v. Bunston*, 84

20

Mont. 597, 599, 277 P. 620, 621 (1929)). In addition, we have explained that "[f]or an objection to be contemporaneous and thus preserve an appeal, it must be 'made at trial in a timely manner and upon specific grounds, which appear on the record, and which is made as soon as the ground for the objection becomes apparent.' " *State v. Azure*, 2002 MT 22, ¶ 44, 308 Mont. 201, 41 P.3d 899 (citing *State v. Stuit*, 268 Mont. 176, 182, 885 P.2d 1290, 1294 (1994)).

¶63 In this case, Dewitz did not raise a contemporaneous objection to Ashley's testimony even though the grounds for the objection were clearly apparent at the time. Instead, Dewitz waited until after both the prosecution and the defense had completed their examinations of Ashley before he raised his 404(b) claim, and then he did so by way of a motion for a mistrial. This is not a permitted tactic. Waiting to raise an objection to allegedly improper testimony until a motion for mistrial waives the objection as untimely when the objection could have been raised at the time the testimony was offered. *See State v. Schwein*, 2000 MT 371, 303 Mont. 450, 16 P.3d 373; *State v. Paoni*, 2006 MT 26, 331 Mont. 86, 128 P.3d 1040.

¶64 Accordingly, we hold that Dewitz waived appellate review of his 404(b) claim by his failure to make a timely objection.

**Issue 5.**

¶65 *Did the District Court abuse its discretion when it refused to instruct the jury that Ashley was an accomplice as a matter of law?*

¶66 When we consider whether a trial court has correctly instructed the jury in a criminal case, we determine whether the instructions, taken as a whole, fully and fairly

21

instructed the jury on the law applicable to the case. *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7 (citing *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, 152 P.3d 698; *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, 61 P.3d 749). And, recognizing that a trial court has broad discretion when it instructs a jury, we review the court's decisions regarding jury instructions to determine whether the court abused its discretion. *Cybulski*, ¶ 34 (citing *State v. Bieber*, 2007 MT 262, ¶ 22, 339 Mont. 309, 170 P.3d 444; *State v. Swann*, 2007 MT 126, ¶ 32, 337 Mont. 326, 160 P.3d 511). To determine whether the court abused its discretion in instructing the jury, we look at whether the court acted arbitrarily or exceeded the bounds of reason resulting in substantial injustice. *Cybulski*, ¶ 34 (citing *Bieber*, ¶ 22; *State v. English*, 2006 MT 177, ¶ 50, 333 Mont. 23, 140 P.3d 454). To constitute reversible error, any mistake in rendering the instructions must prejudicially affect the defendant's substantial rights. *Cybulski*, ¶ 34.

¶67 In this case, the District Court instructed the jury on the issue of accountability as follows:

> **Witness Legally Accountable**
> 1. A person is legally accountable for the conduct of another when either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. *The trier of fact must determine if Tanisha Ashley is legally accountable in this case.*
> 2. The testimony of one legally accountable ought to be viewed with distrust.
>
> 3. A conviction cannot be had on the testimony of one legally accountable unless it is corroborated by other evidence which

in itself, and without the aide of the testimony of the person legally accountable, tends to connect the Defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [Emphasis added.]

¶68 Dewitz contends that the District Court abused its discretion when it failed to instruct the jury that Ashley was an accomplice as a matter of law, and instead, left the question of Ashley's accountability for the jury to decide. Because the State initially charged Ashley with the same criminal activity with which it had charged Dewitz, Dewitz maintains that the State based its case on accomplice testimony and that a defendant is entitled to special protections when an accomplice testifies at trial, such as requiring other corroborating evidence.

¶69 The State argues that the District Court did not abuse its discretion in instructing the jury because the parties disagreed over whether Ashley was an accomplice. On that basis, the State maintains that the court correctly left the issue for the jury to decide.

¶70 Dewitz points to our holding in *State v. Johnson*, 276 Mont. 447, 452, 918 P.2d 293, 296 (1996), for the proposition that "[o]ne who is chargeable with the same crime as a defendant is an accomplice." In *Johnson*, the State charged the defendant Jesse Johnson with criminal mischief and criminal endangerment stemming from the destruction of another's vehicle. The State also charged two other individuals, Eddie Johnson and Sunshine Perez, with criminal mischief for taking part in destroying the vehicle. Eddie pled guilty and agreed to testify against Jesse at his trial. Sunshine entered into a deferred prosecution agreement with the State wherein the State agreed to

23

dismiss the criminal mischief charge if she also testified against Jesse. *Johnson*, 276 Mont. at 448-49, 918 P.2d at 293-94.

¶71 Prior to trial, the State dismissed the criminal endangerment charge against Jesse. At Jesse's trial on the criminal mischief charge, the State conceded that the only evidence connecting Jesse to the crime was the testimony of Eddie and Sunshine. The State also conceded that Eddie was an accomplice, but argued that Sunshine was not. The State maintained that Sunshine had not committed any crimes even though it continued to threaten her with prosecution for criminal mischief if she did not testify against Jesse. Jesse moved to dismiss on the grounds that the State failed to prove its case because the only evidence that connected him to the crime came from accomplices. The court denied his motion and Jesse was convicted of criminal mischief. *Johnson*, 276 Mont. at 449-50, 918 P.2d at 294.

¶72 In reversing the district court, we expressed our disapproval of the State's tactic of threatening to prosecute Sunshine for criminal mischief while maintaining that she was not an accomplice for purposes of trying Jesse for the same crime. "To procure her testimony by such a threat and then argue to the . . . jury that there is no basis for finding that she was accountable for the crime was the kind of duplicitous conduct by an officer of the court that cannot be sanctioned by the law." *Johnson*, 276 Mont. at 452, 918 P.2d at 296.

¶73 Contrary to Dewitz's assertions, the facts in Johnson are distinguishable from the facts in the instant case, and the duplicitous conduct that this Court found offensive in *Johnson* is not present here. Unlike *Johnson*, in the case *sub judice* the State dismissed

24

the charge of accountability against Ashley *prior* to trying Dewitz. The State did not continue to threaten to prosecute Ashley by way of a deferred prosecution agreement, as the State did to the witness in *Johnson*, while it tried Dewitz. Here, the prosecutor explained that the State initially charged Ashley because she had rented the rooms at the motel, and she was there when the police arrived on the scene. The State dismissed the charge, however, after further investigation revealed that Ashley was not involved in setting up the meth lab.

¶74 We stated in *Johnson* that "[t]he issue of whether a witness for the State is an accomplice is—unless such fact is undisputed—for the jury, based on proper instruction from the court." *Johnson*, 276 Mont. at 451, 918 P.2d at 295; *see also State v. Blackcrow*, 1999 MT 44, ¶ 21, 293 Mont. 374, 975 P.2d 1253 ("Whether a person may be held legally accountable for the conduct of the defendant, and so qualify as an accomplice for purposes of the 'accomplice testimony corroboration rule,' is, unless undisputed by the parties, a matter of fact to be determined by the jury."). Because the parties disagreed in this case over whether Ashley was an accomplice, the District Court correctly left that issue for the jury to decide.

¶75 Accordingly, we hold that the District Court did not abuse its discretion when it refused to instruct the jury that Ashley was an accomplice as a matter of law, and we affirm on this issue.

**Issue 6.**

¶76 *Did the District Court err in denying Dewitz's motion to dismiss for insufficient evidence?*

25

¶77 We review a district court's denial of a motion to dismiss for insufficient evidence de novo. *Cybulski*, ¶ 42 (citing *State v. Rosling*, 2008 MT 62, ¶ 33, 342 Mont. 1, 180 P.3d 1102; *Swann*, ¶ 19; *State v. McWilliams*, 2008 MT 59, ¶ 37, 341 Mont. 517, 178 P.3d 121). Furthermore, we consider evidence to be sufficient if, after viewing it in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Cybulski*, ¶ 42; § 46-16-403, MCA.

¶78 Dewitz argues on appeal that all of the evidence connecting him to the meth lab stemmed from Ashley's testimony and, since she was an accomplice, her testimony needed to be corroborated, which, Dewitz claims, the State failed to do. Dewitz maintains that when the evidence admitted through Ashley is removed from the analysis, there is not sufficient independent corroborative evidence to support a conviction.

¶79 The State argues that Ashley was not an accomplice, thus her testimony did not need to be corroborated. The State contends however, that even if Ashley were considered an accomplice, there was sufficient evidence admitted at trial to corroborate her testimony. In fact, the State maintains that the testimony of Julia Menendez, Ashley's mother, regarding telephone conversations she had with both Dewitz and Ashley on the night of the fire was sufficient in itself to corroborate Ashley's testimony.

¶80 We have expressly stated that it is not the defendant's burden to prove that he had no connection with the crime. The burden is on the prosecution to produce corroborating evidence which, of itself and without aid or direction from the accomplices' testimony,

26

connects the defendant with the crime charged. *State v. Kemp*, 182 Mont. 383, 388, 597 P.2d 96, 100 (1979) (citing *People v. Robinson*, 392 P.2d 970, 987 (Cal. 1964)).

¶81 As the State points out in its brief on appeal, Dewitz is essentially arguing that without Ashley's testimony there is no evidence placing Dewitz in Missoula and in the motel room containing the meth lab. On the contrary, we conclude that the State did present sufficient evidence to corroborate Ashley's testimony.

¶82 Menendez testified at trial that Dewitz accompanied Ashley on the trip to Oregon and that, before arriving in Missoula, Ashley phoned Menendez because Ashley and Dewitz were arguing about whether to stop in Missoula or continue on to Oregon. Menendez stated that Ashley did not want to stop in Missoula and that they discussed Ashley and Mia making the trip the rest of the way by bus. Menendez also testified that Ashley called her again later that evening to report that there was a fire in the room next to hers and that Dewitz had left Ashley and her baby in Missoula. Menendez further testified that she received a call from Dewitz at some point that same evening in which he was crying and hysterical. Dewitz told her that he had been burned "real bad" in a fire and that he left Ashley and the baby at the motel in Missoula and that he did not know what to do.

¶83 In addition, the State introduced booking photos from Dewitz's arrest in Oregon shortly after the fire in Missoula. These photos showed Dewitz with burn marks on his face and arms. The State also presented Officer Brueckner's report of the investigation from that evening wherein she stated that witnesses at the motel on the night of the fire told her that shortly after the fire alarm sounded, they saw a black woman and a white

man get into a Subaru and leave. One witness identified Ashley as the woman who left. All of this information corroborated Ashley's testimony that Dewitz was burned in the fire in room 330 and that she left the motel after the fire started with Dewitz.

¶84 In addition, Detective Brodie testified that one of the reports from the fire department stated that a cat had been rescued from room 330. This information corroborated Ashley's testimony that prior to going to her own room at the motel, she carried Dewitz's cat inside the motel and placed it in Dewitz's room.

¶85 Determinations of the credibility of witnesses and the weight of their testimony are within the exclusive province of the jury, and conflicting testimony does not render the evidence insufficient to support a guilty verdict. *State v. Borsberry*, 2006 MT 126, ¶ 20, 332 Mont. 271, 136 P.3d 993 (citing *State v. Shields*, 2005 MT 249, ¶ 19, 328 Mont. 509, 122 P.3d 421).

¶86 In *State v. Black*, 2003 MT 376, ¶ 24, 319 Mont. 154, 82 P.3d 926, we set forth the following test for reviewing the sufficiency of corroborating evidence:

> To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. Corroborating evidence may be circumstantial and can come from the defendant or his witnesses.

Moreover, "[c]orroborating evidence is not insufficient just because it is circumstantial, disputed or even possibly consistent with innocent conduct; it is up to the jury to resolve factual questions." *Black*, ¶ 24 (citing *State v. Kaczmarek*, 243 Mont. 456, 460, 795 P.2d 439, 442 (1990)). Furthermore, "[c]orroborating evidence need not extend to every fact

to which the accomplice testifies." *Black*, ¶ 24 (citing *State v. Ungaretti*, 239 Mont. 314, 318, 779 P.2d 923, 925 (1989)).

¶87 Viewing the evidence in this case in the light most favorable to the prosecution, as we are constrained to do, *Cybulski*, ¶ 42, a rational trier of fact could conclude beyond a reasonable doubt that Dewitz not only accompanied Ashley to Missoula, but that he was the individual that occupied the motel room containing the meth lab.

¶88 Accordingly, we hold that the District Court correctly concluded that Ashley's testimony was corroborated by sufficient independent evidence to be submitted to the jury, and that the court did not err in denying Dewitz's motion to dismiss for insufficient evidence.

**Issue 7.**

¶89 *Did the prosecutor commit misconduct in her closing argument to the jury?*

¶90 During the State's rebuttal closing arguments, the prosecutor made the following comments to the jury:

> MS. MORGAN [for the State]: . . . We really had nothing to tie [Ashley] to that room with the exception of the fact that she said she entered it when they first arrived at the hotel. If we had had something to tie [Ashley] to that room, we probably would have charged her.
>
> .   .   .
>
> [MS. MORGAN:] Furthermore, the defense makes issue over the presence of the plea agreement signed by [Ashley], and you guys will have a chance to review that. I would like to emphasize to you that plea agreements are not binding. They're simply something that we give to the court and say, "Hey, I'm the prosecutor. I think that this is how this should be handled."

29

¶91 Dewitz argues that these statements were improper and prejudiced his right to a fair and impartial trial. The State argues on the other hand that Dewitz failed to show that the prosecutor's statements were improper, let alone prejudicial.

¶92 A defendant must demonstrate that the alleged prosecutorial misconduct violated his substantial rights in order for the Court to reverse a conviction. *State v. Soraich*, 1999 MT 87, ¶ 20, 294 Mont. 175, 979 P.2d 206 (citing *State v. Arlington*, 265 Mont. 127, 150, 875 P.2d 307, 325 (1994)). We will not presume prejudice from claims of prosecutorial misconduct. *Soraich*, ¶ 20 (citing *State v. Hildreth*, 267 Mont. 423, 433, 884 P.2d 771, 778 (1994)).

¶93 In the instant case, we conclude that the prosecutor's comments were not so egregious as to deprive Dewitz of his right to a fair trial. In his closing argument, Dewitz's counsel directed the jury to the charges set forth in the Information filed against Ashley and the plea agreement she entered into with the State, suggesting that Ashley was not credible because of the plea agreement. Thus, counsel opened the door for the prosecutor's comments regarding the plea agreement, and, in rebuttal, the prosecutor appropriately explained why it did not consider Ashley to be an accomplice. *See State v. Maier*, 1999 MT 51, ¶ 93, 293 Mont. 403, 977 P.2d 298; *State v. Whitlow*, 285 Mont. 430, 445, 949 P.2d 239, 249 (1997).

¶94 Furthermore, as we stated previously in this Opinion, "[w]e will not put a district court in error for an action in which the appealing party acquiesced or actively participated." *Harris*, ¶¶ 32-33.

¶95  Accordingly, we hold that the prosecutor did not commit misconduct in her rebuttal argument to the jury, and we affirm on this issue.

¶96  Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE